# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LEWIS FITE, DWAYNE COLEMAN,** | ) | |
| **CHARLES KIRK, DEANGELIS ASHFORD,** | ) | |
| **GIL PEARSALL and CEDRIC HEMPHILL,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Case No. 3:09-0020** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **COMTIDE NASHVILLE, LLC,** | ) | |
| **COMTIDE S, LLC, COMTIDE CAR** | ) | |
| **UNIVERSE, LLC, NISSAN OF COOL** | ) | |
| **SPRINGS, LLC, VINCENT ROBERT** | ) | |
| **CACCESE and MICHAEL MCLEAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court are the following motions filed by the defendants: (1) Motion to Dismiss Complaint Against Michael McLean; (2) Motion to Dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)] and (3) Motion for Summary Judgment. (Docket Nos. 22-24.) For the reasons discussed herein, the court will grant the Motion to Dismiss as to Mr. McLean and will dismiss him from the case, without prejudice. While the Rule 12(b)(6) Motion to Dismiss is untimely, in the interests of justice, the court will interpret that motion as a supplement to the Motion for Summary Judgment. In large part, the court will deny the defendants' Motion for Summary Judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are African-Americans who worked at Nissan of Cool Springs (NOCS), a

1

defendant in this case and a car dealership that was located in Franklin, Tennessee.[1]  Plaintiffs Lewis Fite, Charles Kirk, DeAngelis Ashford, Dwayne Coleman, and Cedric Hemphill were hired to work as salespeople at NOCS, and plaintiff Gil Pearsall was initially hired to sell used cars at Comtide Car Universe before being transferred to a salesperson position at NOCS.  The plaintiffs all worked for NOCS for a relatively brief period, all starting in September 2007 and leaving no later than January 29, 2008.

During their employment, each plaintiff had some degree of contact with defendant Vincent Caccese, who was hired as the General Manager of NOCS in November 2007.  NOCS was one dealership of several in a Franklin, Tennessee "Complex," where various car dealerships selling different (but associated) brands of cars were located.  During the relevant time period, the General Manager of that Complex was defendant Michael McLean, and he supervised Caccese, amongst others.

The precise association between the specific "Comtide" entities sued by the plaintiffs and NOCS remains unclear.  "Comtide" was, to some extent, responsible for NOCS.  As the defendants recognize, an individual named Dan Schmidt owned NOCS and the Comtide companies, and Schmidt was one of Caccese's supervisors.  (Docket No. 31 at 3, 13.)  Additionally, the "Controller" at NOCS, Lisa Ruffner, submitted an affidavit in which she stated that her immediate supervisor during the relevant time period was located in the "Comtide

_____

[1]Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket Nos. 28 and 31) and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Corporate Office." (Docket No. 24 Ex. B at 2.)

The defendants, however, assert that the Comtide entities sued were not all responsible for the plaintiffs' employment. The defendants have submitted the affidavit of Michael Feyes, a "corporate officer" at Martin Management Services, Inc. (MMSI). (Docket No. 24 Ex. D at 1-2.) Mr. Feyes states that, on January 14, 2009, the Comtide entities and NOCS went into Receivership and that MMSI was appointed as the Receiver. (*Id.*) Mr. Feyes further states that the Comtide entities and NOCS constitute four "separate legal entities . . . [and] [e]ach had its own separate management team that included, but [was] not limited to, General Manager, Sales Manager, Controller, and Sales." (*Id.* at 2.) Further, Feyes claims that the four entities were sold to R.C. Alexander Group on August 31, 2009, and each "required a separate closing." (*Id.*)

Further factual background on each plaintiff is appropriate.

### A. Lewis Fite

Plaintiff Fite was hired by NOCS on September 3, 2007 and left NOCS by walking off of the job on January 18, 2008. (Docket No. 29 Ex. 1 at 29.) While Fite was hired as a salesperson, on October 1, 2007, he was promoted to Floor Manager, which gave him additional responsibilities, including overseeing the work of some of his co-plaintiffs. About a month before the end of his brief employment, Caccese also gave Fite the role of Finance Manager, after significant problems were discovered with the performance of the previous Finance Manager. While at NOCS, Fite reported directly to Sales Manager Dan Demar. Demar's immediate supervisor was Caccese.

At his deposition, Fite testified that, from the time Caccese arrived in the "middle of November to the time [Fite] left in January," Caccese (joined by Demar) subjected him to daily

3

racial harassment, including repeatedly referring to Fite as a "good Muslim," making racist jokes in Fite's presence, and making racist comments about customers, including the comment that African-Americans are "always try[ing] to get something for nothing." (Docket No. 29 Ex. 1 at 34-37.) At his deposition, Fite testified that Caccese and Demar were biased against other minorities as well, consistently referring to Eastern Indian people as "darts" and expressing a strong dislike of Jewish people. (*Id.* at 102.)

Most notably, Fite testified that, on one occasion shortly after Caccese started working at NOCS, Caccese told Fite that he planned to "lighten up the place." (*Id.* at 40-41.) Fite testified that he interpreted that comment to mean that Caccese was going to fire dark-skinned people and hire light-skinned people. (*Id.*) According to Fite, this interpretation was confirmed when a "few hours later you've got Caucasian applicants coming in interviewing for jobs and [Caccese] said 'this is what I'm talking about.'" (*Id.*) That is, Fite claimed that Caccese made the "lighten up" comment to him and, then, in short order, Fite observed Caucasian individuals interviewing for jobs at NOCS, and Cassese then indicated to Fite that the prospective employees would "lighten up the place."

Fite testified that, after repeatedly telling Caccese that his jokes and comments were "not cool" and asking him to stop, he brought his concerns to defendant Michael McLean just before Christmas 2007. (*Id.* at 38-39.) While Fite testified that McLean listened intently to Fite's concerns about Caccese and Demar, ultimately, McLean made himself unavailable to Fite following the meeting and did not take any substantive steps to address Fite's concerns. (*Id.*)

Fite also testified that, shortly after Caccese's arrival, Caccese changed the pay scale for the two African-American floor managers, that is, Fite and plaintiff Coleman. Specifically, Fite

4

testified that, while nothing substantive happened to the pay of white managers, his pay (along with Coleman's) was reduced from about $7,000 per month (paid in weekly checks) to about $1,000 per month (paid in a single "bonus check"), on the justification that Fite's and Coleman's pay was now tied to the profitability of NOCS, which was not profitable at the time.[2] (*Id.* at 54-55, 58-66.) Fite also testified that Caccese did other things to drive him away from NOCS, including, in December 2007, switching Fite's dealership-provided vehicle from a high-end model to a low-end base model. (*Id.* at 100.) Fite testified that, in light of the comments, the drastic reduction in pay and other slights connected to his race, he walked off of the job on January 18, 2008. (*Id.* at 30.)

As discussed below, many of the plaintiffs make similar allegations of racism at NOCS. The defendants submitted affidavits and other evidence to counter the plaintiffs' claims. For instance, as noted above, the defendants submitted the affidavit of Lisa Ruffner, the Controller at NOCS during the relevant time period, who stated that she had never heard "racial comments, racial slurs or statements with racial overtones" while she was at NOCS. (Docket No. 24 Ex. B at 2.) Dan Demar submitted a similar affidavit, claiming to have never made such comments and claiming that he had never heard Caccese make such comments either. (Docket No. 24 Ex. C.) Former NOCS salesman Mark Harmon, who worked with Caccese, Demar and the plaintiffs throughout the relevant time period, made similar representations. (Docket No. 24 Ex. E.)

In his deposition, Caccese testified that Fite was an "adequate" floor manager who did a "rough" job as Finance Manager. (Docket No. 29 Ex. 7 at 56-59.) As to the circumstances of

---

[2] For his work at NOCS, Fite's 2007 and 2008 W-2 statements indicate that he was paid $18,779.13 for 2007 and $4,923.10 for 2008. (Docket No. 24 Ex. A at 33-34.)

Fite's departure, Caccese stated that "Mr. Fite walked out and left" his job at NOCS, that is, he "didn't say anything to anybody. [And I n]ever heard from him again." (*Id.* at 93.) Caccese repeatedly testified that he never used racist language at NOCS and never implied that he would drive out dark-skinned people from NOCS. (*Id.* at 65, 96-97, 101-105.)

### B.    Dwayne Coleman

Plaintiff Coleman was hired on September 17, 2007 and left NOCS on January 28, 2008. Like plaintiff Fite, Coleman was promoted to Floor Manager on October 1, 2007, and he reported directly to Demar. Coleman makes allegations that are very similar to Fite's. Coleman testified that, a few days after Caccese began working at NOCS, Caccese began repeatedly referring to him and other African-American employees as "good Muslims" and that this conduct continued, despite Coleman's objecting to it and telling Caccese to stop. (Docket No. 29 Ex. 2 at 51-53.) Coleman testified that Caccese also repeatedly referred to the African-American salespeople as "thugs," "drug dealers" and "rappers." (*Id.* at 54.) Coleman also confirmed Fite's recollections of Caccese and Demar making extremely negative comments about other ethnic groups, including Jews. (*Id.* at 56.)

Coleman also stated that, under Caccese's pay restructuring, his pay was drastically reduced and largely consisted of a monthly $1,000 "bonus" check.[3] (*Id.* at 66.) Like Fite, Coleman also testified that Caccese took away his high-end "demo" vehicle and replaced it with a low-end model. (*Id.* at 77-78.) Coleman testified that he left NOCS because the conditions

---

[3] Like Fite, Coleman's claims that his pay was drastically reduced are not clearly confirmed by the W-2s that the defendants filed in support of their Motion for Summary Judgment. The W-2s indicate that Coleman was paid $14,135.44 for the 3 ½ months that he worked at NOCS in 2007 and $5,306.67 for the 28 days that he worked in January 2008. (Docket No. 24 Ex. A at 25-26.)

6

had become "intolerable," and because Caccese was threatening to punish him with further cuts in pay, demotions, and increased job responsibilities. (*Id.* at 63, 72-75.)

The defendants submitted the NOCS "Exit Review" paperwork that was prepared by NOCS at the time Coleman left NOCS. That paperwork indicates that Coleman left because he "ha[d] to go back to Louisiana."[4] (Docket No. 24 Ex. U.) At his deposition, Caccese testified that Coleman "did a good job" at NOCS and that he "was sorry to see him leave." (Docket No. 29 Ex. 7 at 66-67.) As for why he left, Caccese testified that Coleman told him "that he had some issues that he needed to resolve with his ex and his child back in Louisiana and that he would be leaving." (*Id.* at 100.) As noted above, at his deposition, Caccese generally denied ever making any racially insensitive comments at the workplace. (*Id.* at 101-105.)

**C.      Charles Kirk**

Plaintiff Kirk was hired as a salesperson on September 24, 2007, and he walked off of the job on January 29, 2008. Plaintiff Coleman was Kirk's direct supervisor. (Docket No. 29 Ex. 3 at 33.) Kirk testified that, as soon as Caccese arrived, his "draw pay" (that is, the minimum he would be paid per week) was reduced from $500 to $300. (*Id.* at 40.) The defendants concede that such a reduction in "draw pay" occurred, but they claim that it was an across-the-board cost reduction measure that affected all employees of Kirk's stature. (Docket No. 24 Ex. B at 2.)

Kirk, while not happy with the pay cuts, contends that he left NOCS "because of the name calling." (Docket No. 29 Ex. 3 at 44.) That is, he contends that virtually "every time" they talked, Caccese referred to Kirk as a "good Muslim" or "Muslim" and that this conduct began

---

[4]At his deposition, Coleman stated that the Exit Review statement is "inaccurate." (Docket No. 29 Ex. 2 at 63.)

within days of Caccese's arrival and continued until Kirk left. (*Id.* at 45-48.) Kirk estimated that Caccese referred to him as a "Muslim" about four times per day. (*Id.* at 51.) Kirk testified that he complained about the name calling to Fite and Coleman and that they indicated that they were attempting to contact defendant McLean about the issue. (*Id.* at 59.)

The defendants submitted the NOCS Exit Review paperwork for Kirk, which simply states that he "walked out without saying a word." (Docket No. 24 Ex. U.) At his deposition, Caccese testified that Kirk "had a couple run-ins with the managers," and, following one dispute, he was sent home and simply never returned to work. (Docket No. 29 Ex. 7 at 67-73, 100.) In response to repeated questioning at his deposition, Caccese explicitly denied ever referring to African-American employees as "Muslims." (*Id.* at 103-104.)

### D. DeAngelis Ashford

Plaintiff Ashford was hired as a salesperson at NOCS on September 17, 2007 and was terminated on December 10, 2007. Like the other plaintiffs, Ashford claims that Caccese was a racist and that his racist attitudes infected the workplace. Ashford stated that Caccese repeatedly referred to him by various names that either made crude reference to his skin color (such as "dipstick," "Kit Kat" or "blackjack") or that alluded to notorious African-American movie characters (such as "Cornbread"). (Docket No. 29 Ex. 4 at 67-70, 79-80.) Ashford also testified that Caccese told him that he dressed like a "black thug." (*Id.* at 73.)

At his deposition, Ashford testified that, on the day that he was terminated, plaintiff Coleman stopped him on the way into the office and told him that "[Caccese] wants to let you go." (Docket No. 29 Ex. 4 at 46.) When Ashford asked Coleman for an explanation, Coleman apparently responded "[Caccese] said you got a driver's license issue [that] came up." (*Id.*)

8

Ashford claims that, after this, he went into Caccese's office, where he showed Caccese his valid Tennessee driver's license. (*Id.* at 48.) Ashford claims that Caccese was unmoved, telling Ashford "this is a free will state, we can terminate you without reason." (*Id.*) Ashford claims that Caccese gave him the phone number of the DMV, but Ashford's subsequent conversations with the DMV did not reveal any problems with his license. (*Id.* at 48-50.)

It is undisputed that, during the course of his employment, Ashford had a valid Tennessee drivers' license, but, the defendants claim, he was fired because he was not insurable.[5] At his deposition, Caccese recalled little about Ashford, but remembered that he may have had a drivers' license issue. (Docket No. 29 Ex. 7 at 66, 83.) Caccese testified that, when he arrived in November 2007, his superiors (McLean and Dan Schmidt) provided him with a list of employees with insurance/drivers' license issues, including Ashford. (*Id.* at 84.) Caccese testified that, under the policy in place upon his arrival at NOCS, all employees needed to be insurable and have a valid drivers' license or they would be terminated. (*Id.* at 88, 108.)

### E. Gil Pearsall

Plaintiff Pearsall was hired on September 17, 2007 and was terminated on November 19, 2007. Because he was terminated at about the same time that Caccese arrived, Pearsall had limited exposure to Caccese compared with the other plaintiffs. It is undisputed that, for the two months that he worked at NOCS, Pearsall did not have a valid Tennessee drivers' license.

---

[5] While, as discussed below, it is not necessary to reach this issue, the plaintiffs claim that Caucasian employees were permitted more time to resolve problems with their drivers' licenses than Ashford was. While the plaintiffs identify two such employees by name, Van Garrett and Josh Gray, documentation filed with the court indicates that, within a week of their hire dates in 2007, both individuals were confirmed as "acceptable" to the defendants' insurance carrier. (Docket No. 24 Ex. Q-R.)

9

Rather, Pearsall had a Tennessee ID card and, at hire, he signed a waiver with NOCS agreeing that he would sell cars but could not drive them. Pearsall was apparently able to effectively sell cars despite this limitation.. The drivers' license problem could not be easily remedied because the State of Tennessee would not issue Pearsall a license until he paid a $23,000 child support lien. (Docket No. 29 Ex. 5 at 41.) At his deposition, in describing the circumstances of his termination, Pearsall testified that he "never worked for Dan Demar or Vince Caccese, whatever his name is," because on "the first day" that Caccese was at NOCS, Caccese had plaintiff Fite fire him for not having a valid drivers' license. (*Id.* at 52-53, 58-60.)

At his deposition, Caccese testified that Pearsall's employment "ended over his ability to have a driver's license." (Docket No. 29 Ex. 7 at 81.) That is, when he was hired in November 2007, Caccese was informed by his superiors that "there were employees that were working that were uninsurable," and that he needed to correct this. (*Id.* at 81-82.) Caccese testified that he attempted to address this issue with Pearsall, but Pearsall became "very agitated," and "due to the fact that he did not have a driver's license [and] didn't want to talk" about that, Caccese was forced to terminate him. (*Id.* at 82.)

###    F.    Cedric Hemphill

Plaintiff Hemphill was hired on September 17, 2007 and was fired on December 21, 2007. Like Pearsall, the explanation for Hemphill's termination was that he did not have a valid Tennessee drivers' license, although he did have a valid North Carolina drivers' license and, like Pearsall, at the time that he was hired, he signed a waiver stating that he would sell, but not drive, cars while at NOCS.

Like most of the other plaintiffs, Hemphill testified that he had difficulty at NOCS due to

10

Caccese's and Demar's racist attitudes. He testified that, within four or five days of Caccese's arrival, Caccese began, on a daily basis, repeatedly referring to Hemphill as a "thug," a "Muslim," and a "drug dealer" and that he referred to other African-Americans as "monkeys" and made "black jokes." (Docket No. 29 Ex. 6 at 48, 51-52, 64, 75.) In one incident, when Demar felt that Pearsall was overcharging a customer, Pearsall testified that Demar told him that "you are not in the hood no more" and that "you need to quit with all that f–king thug sh-t." (*Id.* at 53.) Hemphill also testified that Caccese and Demar made distasteful comments about people of Indian and Jewish descent. (*Id.* at 54.)

As to the events surrounding his termination, Hemphill testified that, shortly before he was fired, Coleman approached him and told him that there was "an issue" with his drivers' license and that he would be fired if he did not quickly obtain a Tennessee drivers' license. (*Id.* at 58.) Hemphill testified that he spent two weeks or so trying to identify whether he could obtain a Tennessee license, but, he testified, his time essentially "ran out" and he was fired. (*Id.* at 58-59.)

At his deposition, Caccese testified that Hemphill was a "good" sales associate, and that he did not recall why Hemphill was terminated. (Docket No. 29 Ex. 7 at 65.) He did recall that Hemphill may have had a drivers' license issue and that there was an employee who was given a period of time to fix a drivers' license issue but that employee was unable to do so in an appropriate amount of time. (*Id.* at 89-90.)

### G. Procedural Issues

The plaintiffs filed this lawsuit on January 9, 2009. On March 26, 2009, all defendants, aside from McLean, filed an Answer. (Docket No. 12.) On December 18, 2009, after discovery

and an unsuccessful settlement conference, the five participating defendants (Caccese, NOCS and the Comtide entities) filed two motions to dismiss and a Motion for Summary Judgment.

## ANALYSIS

The plaintiffs allege that the defendants violated their rights under 42 U.S.C. § 1981 and the Tennessee Human Rights Act (THRA), T.C.A. § 4-21-101 *et seq*., and also intentionally inflicted emotional distress upon them through outrageous conduct (the "IIED" claim). The five participating defendants have moved to dismiss the non-participating defendant, certain claims, and have also moved for summary judgment.

**I.     The Motions to Dismiss**

**A.     Michael McLean[6]**

The five participating defendants have filed a motion to dismiss McLean from this litigation arguing that, while there was a summons issued to Mr. McLean at NOCS, McLean was not employed by NOCS when the summons was issued and there is no indication that McLean or his authorized agent was ever served with the Complaint in this case. (Docket No. 22 at 1-2.) Supporting the defendants' argument, the summons for McLean in the record indicates that it was sent via certified mail and received by "Robert Padgett" at NOCS on January 13, 2009. (Docket No. 8.) The affidavit of Albert Cota, who works for Paychex, the defendants' payroll services provider, states that McLean left NOCS on September 18, 2008. (Docket No. 24 Ex. A. at 2.)

In response, the plaintiffs argue that the defendants waived the service of process

---

[6] The name of the individual sued in the Complaint is Michael McLean. In briefing, both parties also refer to the individual as "Michael McClean." The court will refer to the individual by the name in which he was sued.

argument by not raising it prior to this point. (Docket No. 25 at 2.) In their Reply, the defendants state that they are bringing the service issue to the court's attention so that they will be able to prepare for trial knowing who the other defendants will be. (Docket No. 36 at 2.)

Proper service of process is a matter tied to constitutional due process and is required before the court can properly exercise personal jurisdiction over a defendant. Therefore, the court should undertake to resolve this jurisdictional issue. *See Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). Indeed, Federal Rule of Civil Procedure 4(m) states, in mandatory terms, that "if a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m).

Here, the method of service that the plaintiffs attempted to use was certified mail delivery. (Docket No. 8.) Federal Rule of Civil Procedure 4 provides that an individual may be served by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made." Fed R. Civ. P 4(e)(1). While the Tennessee Rules of Civil Procedure permit service by mail, unless the package is actually received and signed for by the defendant or his "authorized agent," service of process by mail delivery is not effective. *See Massey v. Hess*, 2006 WL 2370205, *3 (E.D. Tenn. Aug. 14, 2006); Tenn. R. Civ. P. 4.04(10).

Under this standard, the record demonstrates that McLean was not properly served because there is no indication that he or his agent ever received the Complaint. Moreover, it has

13

been more than a year since the Complaint was filed, that is, the plaintiffs' 120 days for service on McLean have long passed. Additionally, the plaintiffs provide nothing in the way of "good cause" or any sort of explanation for the failure to properly serve McLean. (Docket No. 25 at 2.) In light of all of this, the court will dismiss the Complaint as to defendant McLean (or McClean) without prejudice.

### B. Other Matters Raised in Motion to Dismiss Briefing

The participating defendants also filed a Motion to Dismiss pursuant to Rule 12(b)(6). (Docket No. 23.) In this motion, the defendants argue that: (1) the THRA and IIED claims of Hemphill, Pearsall, and Ashford are barred by the one-year statute of limitations for those claims; (2) Comtide Nashville, LLC and Comtide S, LLC were not the plaintiffs' employer and they should be dismissed from the case; (3) there is no support for the plaintiffs' punitive damage claims; (4) plaintiff Kirk's claims are barred by judicial estoppel; and (5) there are insufficient facts to support a Section 1981 claim. (*Id.*)

The plaintiffs correctly argue that a Rule 12(b)(6) motion to dismiss is improper at this stage in the litigation because Rule 12(b) states that such a motion must be filed prior to the filing of the Answer. (Docket No. 25 at 2; *see also* Fed R. Civ. 12(b)). Therefore, the motion, to the extent it seeks relief under Rule 12(b)(6), is untimely. *See U.S. v. Ala. Dept. of Mental Health*, 2010 WL 447399, *4 (M.D. Ala. Feb. 9, 2010). However, these same arguments could have been readily advanced in the defendants' summary judgment motion, and there appears to be no reason for the court not to construe these arguments as essentially being part of the summary judgment motion. *See Langley v. Napolitano*, 2010 WL 26216, *2 (D.D.C. Jan. 6, 2010)(where, as here, a significant factual record existed, construing untimely Rule 12(b)(6)

14

arguments as summary judgment arguments). Therefore, the court will consider the arguments raised in the defendants' untimely Rule 12(b)(6) motion in conjunction with the defendants' summary judgment motion.

## II.     Motion for Summary Judgment

### A.     Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

15

**B.     Judicial Estoppel - Plaintiff Kirk**

The defendants argue that Kirk's claims are barred by judicial estoppel because Kirk did not supplement his bankruptcy petition to reflect his claims in this case.  (Docket No. 23 Ex. 1 at 6.)  According to the documentation filed by the defendants, Kirk filed his Chapter 13 bankruptcy petition on June 13, 2007, that petition was converted to a Chapter 7 petition on February 21, 2008, and Kirk was granted a discharge on June 4, 2008.  (Docket No. 23 Exs. E-G.)  The defendants contend that Kirk was aware of his claims in this case prior to discharge and that  he should have supplemented his petition to reflect his claims, even if that meant that his petition was supplemented after discharge.  (Docket No. 23 Ex. 1 at 6)(citing 11 U.S.C. § 350, which permits bankruptcy cases to be re-opened).

In response, the plaintiffs argue that it would be unfair to dismiss Kirk from this case on estoppel grounds, particularly because he filed for bankruptcy before his employment with the defendants even began and because he was discharged several months before he joined the other plaintiffs in filing the Complaint.  (Docket No. 25 at 5.)   Moreover, the plaintiffs assert that Kirk "has [recently] counseled with and engaged bankruptcy counsel to reopen his bankruptcy action in the event that Plaintiff Kirk achieves a recovery on his employment claims."  (*Id.* at 6.)

 The Sixth Circuit has held that "[t]he doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition." *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002)(internal quotation omitted).  As the debtor's duty to disclose his assets to the bankruptcy court (including potential causes of action) is a "continuing one" and "at the very core of the bankruptcy

16

process," the Sixth Circuit has found that judicial estoppel should be applied to bar causes of action that were not properly disclosed to the bankruptcy court.  *See Lewis v. Weyerhaeuser Co.*, 141 Fed. Appx. 420, 425 (6th Cir. 2005); *see also Bohanan v. Bridgestone/Firestone North American Tire*, *LLC*, 2007 WL 1091209 at *3 (M.D. Tenn. April 10, 2007).  However, the Sixth Circuit has also held that the application of judicial estoppel is "inappropriate when [the] omissions are the result of mere mistakes or inadvertent conduct."  *Eubanks v. CBSK Fin. Group*, 385 F.3d 894, 898 (6th Cir. 2004).

Here, it appears that Kirk's failure to supplement his petition was the result of excusable inadvertence.  Indeed, the plaintiffs did not even file this lawsuit until seven months after Kirk was discharged from bankruptcy and, while Kirk may have felt discriminated against at NOCS, there is no suggestion that, when his asset schedule was "fresh" in his mind, he knew that he had a concrete, potentially valuable claim against these defendants.  At his deposition, Kirk seemed baffled by the notion that he would have had to disclose this litigation on his bankruptcy petition, and the plaintiffs now contend that they are taking steps to re-open the case in the event that Kirk has a valuable claim.  (Docket No. 29 Ex. 3 at 67-68.)  In short, there is nothing in the record to suggest that Kirk acted in a way that should bar him, on an equitable basis, from being permitted to pursue this litigation here.  The defendants' attempt to dismiss Kirk as a plaintiff in this litigation will be denied.

### C.       Statute of Limitations/IIED Claim

The defendants also argue that, because plaintiffs Hemphill, Ashford and Pearsall were all terminated more than one year prior to the date that this litigation was filed, their THRA and

17

IIED claims are barred by Tennessee's one-year statute of limitations for those claims. (Docket No. 23 Ex. 1 at 2.)(citing T.C.A. § 4-21-311(d); *Mackey v. Judy's Foods*, 867 F.2d 325, 329 (6th Cir. 1989)). In response, the plaintiffs argue that the defendants have done nothing more than allege, in a conclusory fashion, that these claims are time-barred. (Docket No. 25 at 3.) The court, having reviewed the record in this case, finds no evidence that Hemphill, Ashford and Pearsall suffered any cognizable THRA or IIED injury following the dates of termination, which all occurred more than one year prior to the date that the Complaint was filed. Therefore, plaintiffs Hemphill, Ashford and Pearsall may not pursue claims under the THRA and for IIED.

It is also clear that the IIED claim is not viable for the remaining plaintiffs. A requirement of any IIED claim is that the plaintiff establish "serious mental injury" as the result of intentional, outrageous conduct. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). In their depositions, Fite, Coleman, and Kirk all indicated that, while they were upset by the events at NOCS, they had not suffered any severe mental injury. (Docket No. 29 Ex. 1 at 158-59)(Fite testified that the situation was "stressful" and "really difficult" and that he talked to his pastor about the incidents, but he had not sought other counseling); (Docket No. 29 Ex. 2 at 111)(Coleman testified that he did not seek out any treatment, was "kind of depressed about it for a while" but worked through his upset on his own); (Docket No. 29 Ex. 3)(no suggestion from Kirk's deposition or the record that he suffered severe mental injury). Therefore, the plaintiffs' IIED claims will be dismissed.

### E. The Entity Defendants (Comtide Nashville and Comtide S)

In their motion, the defendants state, in purely conclusory fashion, that the plaintiffs were not employed by Comtide Nashville, LLC or Comtide S, LLC and that the plaintiffs "can not

18

[sic] prove any set of facts that would impose liability on either of those entities as they were separate and distinct from NOCS or Comtide Car Universe, LLC." (Docket No. 23 Ex. 1 at 3.) In response, the plaintiffs, again, state that the arguments in the defendants' motion are conclusory and claim that all of the "Comtide" defendants owned the NOCS dealership and the other dealerships in the "Complex." (Docket No. 25 at 3; Docket No. 27 at 1-2.) The plaintiffs provide no documentary support for this argument, and, while the plaintiffs called Caccese as the Rule 30(b)(6) witness for the entity defendants, he had absolutely no knowledge of the organizational and operational structure of these entities. (*See* Docket No. 29 Ex. 7 at 32-36.)

While the record indicates an association between the "Comtide" brand and NOCS, it is not possible for the court to determine whether Comtide Nashville, LLC and Comtide S, LLC (as independent entities) were involved in the plaintiffs' employment or not. Therefore, the court, at this stage, cannot grant or deny relief to the defendants on this issue. The court would suggest, however, that the parties have danced around this issue throughout this litigation, yet this issue (which entities were actually responsible for the plaintiffs' employment) is one that should be susceptible to resolution by the parties without significant court involvement. In the time prior to trial, the court suggests that the parties attempt to reach a resolution on this issue to avoid confusion of the jury and waste of time.

### E. Race-Based Claims

Asserting Section 1981 and the THRA as grounds for relief, the plaintiffs claim that the defendants (1) discriminated against them on the basis of race; (2) created a hostile work

19

environment; and (3) retaliated against them.[7]

### 1. Racial Discrimination

The defendants argue that "[s]ummary judgment should be granted in favor of Defendants on Plaintiffs' claims under Section 1981 and the THRA because there is insufficient evidence from which a reasonable inference can be drawn that race was a motivating factor in any of Defendants' employment decisions relating to Plaintiffs." (Docket No. 24 Ex. 2 at 2.) That is, the defendants argue that three of the plaintiffs were fired for not having a valid drivers' license and/or not being insurable and the other three simply left the company and now attempt to "sensational[ize] benign facts." (*Id.*)

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be

---

[7]These claims are asserted against the corporate entities that acted as the plaintiffs' employer and also against Caccese as an individual. While Section 1981 and THRA claims against an employer are typical, claims against an individual employee are less common. The validity of individual liability under Section 1981, however, was established in *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir. 1986). Generally, as here, if a supervisor with hiring and firing authority can be directly connected to the discriminatory conduct, a Section 1981 action against that individual is proper. *Whidbee v. Garzarelli Food Specialities, Inc.*, 223 F.3d 62, 75 (2nd Cir. 2000). The THRA "generally does not impose individual liability on supervisors or co-workers" for discrimination in the workplace. *Rhea v. Dollar Tree Stores*, 395 F. Supp. 2d 696. 705-06 (W.D. Tenn. 2005). However, the THRA does impose liability on "an individual who aids, abets, incites, compels, or commands an employer to engage" in discriminatory conduct prohibited by the THRA. (*Id.* citing T.C.A. § 4-21-301(2)). Individual liability under the THRA, therefore, requires "affirmative misconduct by the individual defendant" beyond the defendant's own discriminatory acts. *Id.* Therefore, when a supervisor commands another employee to engage in a discriminatory act or practice, individual liability under the THRA is warranted. *Id.* Here, Caccese is alleged to have directed Coleman and Fite to fire others based upon Caccese's racial animus. Therefore, a THRA claim against Caccese individually is appropriate under the theory that he commanded his employer to engage in conduct that violated the THRA. *Id.*

20

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. To establish a claim of racial discrimination under Section 1981, the plaintiffs must show that (1) they belong to an identifiable class of persons who are subject to discrimination based upon their race; (2) the defendant(s) intended to discriminate against them based upon their race; and (3) the defendants' discriminatory conduct abridged a right enumerated in Section 1981(a). *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).

In the absence of an explicit contractual relationship, an "at will" employee (like the plaintiffs here) may still sue for discriminatory discharge under Section 1981, under the theory that the employee's ability to "make and enforce" the implied employment agreement between the parties was impaired by the discriminatory discharge. *Person v. Progressive Logistics Services LLC*, 418 F. Supp.2d 1006, 1011-12 (E.D. Tenn. 2006)(collecting cases). Therefore, the plaintiffs easily satisfy the first and third prongs of the Section 1981 test.

As to the second, "intent" prong, the plaintiffs may establish "intent" through direct evidence or through circumstantial evidence analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Amini*, 440 F.3d at 358. "Direct evidence" is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)(internal quotation omitted). To survive summary judgment through the assertion of direct evidence, the plaintiff must raise a disputed issue of fact as to whether the employer was predisposed to discriminate on the basis of race and as to whether the employer acted on that predisposition. *Id.*

21

In *DiCarlo*, the plaintiff alleged that the Postal Service had discriminated against him on the basis of his Italian-American heritage, specifically claiming that his supervisor called him a "dirty wop" and that his supervisor complained that there were too many "dirty wops" working at the postal facility. *Id.* at 415-416. While the supervisor denied ever having made the comments, the court found that the alleged comments by the supervisor, combined with the close temporal proximity (three weeks) between the comments and the plaintiff's termination, was sufficient to raise an issue of fact as to whether the employer was predisposed to discriminate and whether the employer acted on that predisposition. *Id.* at 415-17. As the plaintiff had provided sufficient direct evidence of discrimination to avoid summary judgment, the plaintiff did not need to attempt to establish an inferential case of discrimination through burden-shifting. *Id.*

This case is similar to *DiCarlo*. Here, all of the plaintiffs who worked under Caccese state that he subjected them to frequent racial harassment and race-based comments and jokes. Fite testified that, in this racially-charged environment, Caccese told him that he planned to "lighten up the place," an obvious reference to removing African-Americans and replacing them with Caucasians. Fite alleges that, in short order, Caucasians began interviewing for jobs at NOCS and Caccese, alluding to the interviews, made a comment implying that the hiring of Caucasians was what he meant by "lightening" up the place. This evidence, combined with all of the other allegations of racial insensitively and animus, is easily sufficient to raise a fact issue as to whether Caccese, an individual with decision-making authority, was predisposed to discriminate on the basis of race.

The next question is whether there is a fact issue as to whether Caccese acted on that

22

predisposition. For the three employees who were actually terminated, a fact issue on this point is easily raised. Within weeks of Caccese's arrival, plaintiffs Ashford, Pearsall and Hemphill had all been fired, allegedly, for not having the proper drivers' license or for not being insurable. However, the record indicates that these plaintiffs worked at NOCS for several months prior to Caccese's arrival despite these issues, and that Pearsall and Hemphill had signed waivers stating that, as long as they did not drive, they could work at NOCS. In light of the close temporal proximity between Caccese's arrival, the racially charged comments, and the termination of these plaintiffs, Ashford, Pearsall and Hemphill have raised a fact issue as to whether Caccese acted on racial animus in directing them to be fired.

As to the three plaintiffs who left their jobs, the plaintiffs argue that they were "constructively discharged," that is, Caccese essentially fired them by driving them out of their jobs through constant racial harassment. (Docket No. 27 at 10.) Constructive discharge occurs when harassment is so intolerable as to reasonably cause a resignation. *Penn. State Police v. Suders*, 542 U.S. 129, 147-48 (2004); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996). Here, in light of the allegations of constant race-based comments, jokes, and degradation, a reasonable jury could conclude that these defendants were essentially forced, by Caccese's racial animus, to resign, and, therefore, these defendants also can establish a direct discrimination claim sufficient to survive summary judgment.

As the plaintiffs are able to survive summary judgment on their Section 1981 claim through the use of direct evidence, it is not necessary to address the burden-shifting framework. Additionally, as the standard for evaluating claims of intentional discrimination under Section 1981 is the same as that used under the THRA, the three plaintiffs with timely THRA claims

23

may pursue those claims under a discrimination theory. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000); *See Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006).

## 2. Hostile Work Environment

The plaintiffs have also alleged that they were subjected to a hostile work environment. A claim of a racially hostile work environment is actionable under Section 1981 and the THRA, and claims under both of these statutes are evaluated under the same standard that is used to evaluate hostile work environment claims under Title VII. *See Long v. Ford Motor Co.*, 193 Fed. Appx. 497, 501 (6th Cir. 2006); *Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 602 (Tenn. Ct. App. 2007).

That is, a plaintiff establishes a hostile work environment claim by showing that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment based upon his protected status; (3) the harassment created a hostile work environment; and (4) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). In determining whether there is a hostile work environment, the court must consider the totality of the circumstances, including the frequency of the conduct, its severity, and the degree to which it interferes with work performance. *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993). A work environment is hostile if, from an objective and subjective perspective, the harassment is severe and pervasive enough that an "abusive" working environment is created. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). If the hostile work environment is created by a supervisor with authority over the complaining employee, the employer is vicariously liable for the hostile work

24

environment.[8]  *Clark v. United Parcel Service*, 400 F.3d 341, 348 (6th Cir. 2005).

Here, as discussed in detail above, construing all of the facts in the light most favorable to the plaintiffs, most of the plaintiffs have easily raised an issue of fact as to whether they were subjected to a hostile work environment in violation of Section 1981 and the THRA.   That is, Fite, Coleman, Kirk, Hemphill, and Ashford all testified that they were subjected to essentially constant racial harassment, jokes, along with nasty and undermining comments tied to their race. That is, these plaintiffs have all testified that Caccese's conduct went far beyond a few unfortunate comments here and there, but, rather, that he (and Demar) chronically treated African-American employees with verbally abusive disrespect.

Pearsall, however, testified that he never worked for the two individuals (Caccese and Demar) who the plaintiffs allege were responsible for the hostile work environment.  Therefore, the claims of a hostile work environment under Section 1981 will go forward only as to Fite, Coleman, Kirk, Hemphill and Ashford and, under the THRA, as to Fite, Coleman and Kirk.

### 3.    Retaliation

Section 1981 and the THRA provide protection against workplace retaliation and claims under both statutes are analyzed under the Title VII burden-shifting framework.  *Clark v. Lockheed Martin Energy Sys.,* 287 Fed. Appx. 502, 503 (6th Cir. 2008); *Summey v. Draughons Junior College*, 2008 WL 597648, *7 (M.D. Tenn. Mar. 4, 2008)(Echols, J).  Under that

---

[8]While it would not provide an avenue for summary judgment in this case, the employer has an affirmative defense to liability for the supervisor's conduct if the employer can show that there was no "negative tangible employment action" suffered by the victim, and the employer can show, among other things, that it exercised "reasonable care" in addressing the supervisor's actions.  *Clark*, 400 F.3d at 348.

25

framework, the plaintiffs must, among other things, show "a causal link" between a protected

activity and the adverse employment action. *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463

(6th Cir. 2001). That is, the evidence "must be sufficient to raise an inference that the protected

activity," such as complaining to management about racial harassment, "was the likely reason for

the adverse action." *Id.*

While the plaintiffs have brought forth considerable evidence of racial discrimination and

harassment, they have failed to bring forth evidence sufficient to raise an inference that they

suffered adverse employment actions because of any complaints or objections to management

about the racial harassment. Rather, the plaintiffs' theory, which has been reasonably well

developed to this point, is that Caccese came into his job with a desire to drive African-

Americans from NOCS and that he, in conjunction with Demar, carried this plan out through

terminations and the creation of an abusive and toxic work environment. While there is evidence

that various plaintiffs, on occasion, complained to various superiors about the racial abuse, there

is nothing more than a scintilla of evidence (if that) that the actual and constructive discharges or

the other indignities about which the plaintiffs complain were tied to complaints to management.

Therefore, a "retaliation" theory under the THRA and Section 1981 is not a viable avenue of

relief for the plaintiffs.


### F.      Punitive Damages

While recognizing that the federal and state laws that the plaintiffs are suing under permit

the recovery of punitive damages, the defendants argue that, (1) since the defendants are "out of

business and have no employees," they would have no assets upon which to base a punitive

26

damages judgment, (2) a punitive damages award would not deter future conduct because the entities are defunct, and (3) the defendants' conduct does not rise to the level of egregiousness necessary to sustain a punitive damages award. (Docket No. 23 Ex. 1 at 3.) With the status and culpability of the corporate entities still unsettled and with the significant allegations of pervasive and intentional discrimination already in the record, it would be inappropriate for the court to find, as a matter of law, that this is not a punitive damages case.

## CONCLUSION

Defendant McLean will be dismissed without prejudice from this litigation. All plaintiffs may maintain a claim under Section 1981 based upon a theory of racial discrimination. All plaintiffs except Pearsall may maintain a claim under Section 1981 based upon a theory of a hostile work environment. Plaintiffs Fite, Coleman and Kirk may also maintain claims based upon these theories under the THRA. The plaintiffs' IIED claim will be dismissed, and their "retaliation" theory is unavailing.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge